Peck, J.,
delivered tbe opinion of tbe court:
William H. Stark, who describes himself as a resident of Savannah, in tbe State of Georgia, by bis petition claims tbe net proceeds of ninety-one bales of sea-island and one hundred and thirty-six bales of upland cotton; which net proceeds, amounting to the sum of $68,975 25, be alleges are in tbe trea-siuy of tbe United States.
Mr. Stark was a registered voter in tbe town of Lyme, in the State of Connecticut, on tbe list of electors for April, 1861, though be did not vote at tbe spring election, but bad voted in that town at tbe presidential election on November 6,1860, and voted there again at tbe presidential election for 1868. He owned an estate in Lyme, which be always called home. It is not shown that claimant was tbe owner of any real property elsewhere than at Lyme, Connecticut. Claimant was examined as a -witness, and gives this statement as to bis residence:
“ My residence at tbe outbreak of tbe rebellion was this: I bad a residence in Connecticut, where I spent six months of tbe year, but my residence was in Savannah, where I spent tbe other six months, as I do now. I considered my residence rather in Connecticut; I do now claim a citizenship in Connecticut ; and rather consider I was at tbe outbreak of tbe rebellion.” Which we understand to mean, that be claimed to be a citizen of Connecticut at tbe time of tbe commencement of tbe rebellion.
In another deposition — for this claimant -was examined several times — be says: “I am a native of tbe State of Connecticut, and still retain a home there.” He accounts for bis abandonment of Connecticut and the choice of a new home in Georgia in this way: “I was a member of a firm when tbe war commenced, and endeavored to sell out and get away. They thought I *285 would sell out at any price, and placed so low an estimate on it that I turned round and bought them out.” Thus voluntarily casting his lot among rebels, because of the gain he would make by so doing. “ He chose to pitch his tent toward Sodom, where the men were wicked, and sinners before the Lord exceedingly.”
Having purchased the interests of his copartners in the business at Savannah, he remained there until the close of the rebellion, continuing the business which had previously been conducted by the copartnership. He says: “ I bought and sold, and went on with the citizens of Savannah as before the war j my yearly transactions during the war continued, and accumulated, I should say, to $200,000 the first year; during subsequent years, in inflated currency, to $500,000 or $600,000 a year.”
Besides his regular business in Savannah, which he concedes was carried on by replenishing his stock with merchandise which he was aware had been introduced into the rebellious States by violating the blockade, the claimant entered into a speculating project with one Lama, by which they sought to benefit themselves by dealing largely in merchandise which had been brought into Wilmington, North Carolina, in defiance of the blockade established by the United States. The purchases made on their joint account by Lama, at Wilmington, amounted to $200,000 or $300,000. Claimant says he does not know whether Lama was a Union man or not.
. Claimant made a purchase of Confederate bonds, as he says, as agent, hut is not certain that they were not entered as sold to himself.
There is proof to show that the claimant assisted in warning parties to join the Confederate forces. The claimant seeks to overthrow this testimony by showing that he was not engaged with one Williams, a rebel conscript officer, in warning persons to appear at the front and join the rebel army. It may be that claimant was not with Williams when Williams was notifying the witness and other parties to repair to'the front and join the rebel forces. The witness is nevertheless positive that claimant was an actor in some transaction of the kind, whether, in company with Williams or not. This official conduct of claimant is proved by another witness, who says that after he had received a similar notice, as he was informed through the claim *286 ant, be went and saw Stark at Ms store, and requested bim to let bim off, but that be would not engage to do anything for tbe witness. Claimant did not then deny that be bad given tbe notice, nor tbat be bad been acting in tbe premises as one having authority under tbe rebel government; but, on tbe con trary, by bis conduct, admitted tbat be bad given tbe notice, and bad been exercising such authority, and left the witness still in error, if be really bad not been acting as tbe witness supposed. He at all events did not appear loth to have it beber ed tbat be was in tbe service of tbe rebel government.
Claimant has attempted to prove tbat be was in sentiment loyal to tbe United States. What many witnesses mean by tbe use of tbe word loyal, is not always easy to understand. Many witnesses seem to think if a resident of Georgia x>aid bis cred itors in the loyal States, or reserved bis means to do so, in preference to paying over bis indebtedness to tbe receivers of tbe rebel government, that such conduct furnishes complete evidence of loyalty to tbe United States. There are different tests and many standards of loyalty with those people of tbe South who call themselves Northern adherents, which fall far short of satisfying our minds. Tbe claimant exx>lains bis opinions of loyalty by stating tbat if a man evaded paying to rebel receivers his indebtedness to Northern creditors, it would be reasonable to believe tbat tbat was a sign of Unionism. He says: “I should consider a man who did tbat, a rebel — a man, 1 mean, who paid to rebels a debt due by bim to a Northern man.” He states this test without regard to tbe condition' or circumstances of tbe debtor. It may be tbat a debtor like himself, who bad large means at tbe North, accessible to the process of tbe law, when invoked for tbat purpose by his creditors, might well be anxious, though ever so disloyal, to save bis means as well within as without rebel territory, tbat they might be applied to tbe payment of all bis debts. . If tbe rebellion failed, and of that there was always, even to tbe most blinded, a possibility, bis debts would still remain, and they must be satisfied out of means diminished by what bad been paid to rebel receivers. It is therefore easy to conceive tbat debtors at tbe South might for many other reasons than loyalty to tbe United States, ■ avoid paying to rebel receivers tbe debts they owed to Northern creditors.
Claimant attempts to prove by bis own deposition tbat bis apparent support of the rebellion was hypocritical, and tbat *287 ■underneath his pretenses in that respect,there was a sincere devotion to the United States. He says in reply to the question, what he meant by saying that all Union men had to play the hypocrite, “ that they had to behave with the greatest circumspection, and sometimes pretend to be what they were not.” All this may have been so. If it was, we can only say that such Unionism was but of little use in suppressing the rebellion, or in supporting the Federal Union. If men were so double in their conduct, and so seemed to be the things they were not, that their daily associates and the men who were constantly watching and scrutinizing their action, were deceived by their duplicity; it should not be surprising to those men if we are also perplexed in our efforts to ascertain what their real sentiments or opinions were. If men who have, like Proteus, a facility of “ changing shapes for advantage,” play their parts so well that their daily observers did not know the false from the real man, it hardly can be expected of us, that we shall at this distance of time, with less opportunity for discerning, be more correct or skillful in detecting the truth than were those who had so much better opportunities for doing so.
Mr. Edward Padelford, who is recognized by all parties as having been eminently loyal, says he confided in claimant as a loyal man j but on cross-examination to the question: “ Did not Mr. Stark have as good a reputation as a rebel as he did as a Union man?” he answers: “ I did not hear any particular reputation that he had at all.”
The evidence in this case does not satisfy us that claimant never gave any aid or comfort to the rebellion. ’That his residence in Savannah was voluntary is very apparent. He had a most desirable residence in Connecticut, surrounded by his relatives and friends; and for aught that is shown he had ample means for support. He relinquished all these, with the rebellion pending, because he thought he could make a good bargain with his copartners. He abandoned his patriotism, or gave it in exchange for the profit he hoped to make. How much he was called upon to sacrifice, had he accepted the offer of his copartners, is not shown; it may or may not have been considerable ; he has omitted to inform us what the amount was; therefore we cannot judge of the justification or excuse he had for purchasing their interests. His present predicament with this claim is as little the result of necessity as that of any person can be; to avoid some loss he preferred to remain with *288 rebels; be cbose bis lot, fixed bis condition, and be must abide tbe consequences.
Tbe conduct of claimant and tbe circumstances already ■referred to are sufficient to deprive bim of a recovery. His residence in territory where tbe rebel force beld sway, for tbe purpose of gain, is tbat kind of voluntary residence wbicb tbe statute declares shall b e prima facie evidence of giving aid and comfort to tbe rebellion, and to tbe persons engaged therein; be has not successfully rebutted tbe presumption wbicb tbe statute raises against bim, and bis petition is dismissed.